## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF NEW JERSEY

|  |  |
|---|---|
| **MERIDIAN CONSULTING I CORPORATION, INC.,** | |
| **Plaintiff,** | Civ. No. 19-22197 (KM) (ESK) |
| **v.** | **OPINION** |
| **EUROTEC CANADA LIMITED,** | |
| **Defendant.** | |

### KEVIN MCNULTY, U.S.D.J.:

Meridian Consulting I Corp. (a New Jersey company) owned a helicopter, which EuroTec Canada Ltd. (a Canadian company) worked on. The helicopter crashed near New York City, and Meridian sued EuroTec for claims arising from EuroTec's allegedly substandard work. EuroTec moves to dismiss for lack of personal jurisdiction, improper venue, and *forum non conveniens*, pursuant to Federal Rules of Civil Procedure 12(b)(2), (3), and (6). (DE 32.)[1] For the following reasons, the motion is **DENIED**.

---

[1]     Certain citations to the record are abbreviated as follows:

DE = docket entry

Compl. = Complaint (DE 1)

Agreement = Rotorcraft Service Agreement (DE 35-1)

Golanbari Decl. = Declaration of Hossein Golanbari (DE 35)

Golanbari Dep. = Deposition of Hossein Golanbari (DE 40-7)

Emails = Correspondence between EuroTec and Liberty Helicopters, Inc., employees (DE 40-3)

Resp. = EuroTec's Responses to Meridian's First Set of Interrogatories Regarding Personal Jurisdiction (DE 40-4)

Mot. = EuroTec's Brief in Support of its Motion to Dismiss (DE 33)

Opp. = Meridian's Brief in Opposition to EuroTec's Motion to Dismiss (DE 39)

Reply = EuroTec's Reply in Support of its Motion to Dismiss (DE 43)

I.    **BACKGROUND**

A. **Meridian, Liberty, and EuroTec**

Meridian is a Delaware corporation with its principal place of business in Kearny, New Jersey. (Compl. ¶ 1.) Meridian serves as the record owner of helicopters used for charters and tours by Liberty Helicopters, Inc., also based in Kearny. (*Id.* ¶ 7; Golanbari Dep. at 19:24–25.) This arrangement, whereby one entity serves as record owner and another entity serves as operator, is not uncommon in the private aviation industry. (Opp. at 1; *see* Golanbari Dep. at 36:1–22.)

Meridian/Liberty have, multiple times, contracted with EuroTec, a company in Ontario, Canada, that customizes aircraft. (Golanbari Dep. at 11:15–21, 16:17–19, 24:1–6.) An American company based in Kansas, EuroTec Vertical Flight Solutions, LLC, owns 50% of EuroTec. (Golanbari Dep. at 12:20–13:1, 29:19–24.)

The scope of Meridian/Liberty's relationship with EuroTec is one issue in this case. Generally, EuroTec did not distinguish between Meridian and Liberty. (*See id.* at 25:20–25, 38:13–16, 45:17–46:2.) EuroTec first developed a relationship with Liberty but learned over their course of dealing that the record owner of Liberty-operated helicopters was actually Meridian. (*See id.*) From 2012 to 2014, EuroTec did multiple projects for Meridian/Liberty. (Resp. at 5–6; Emails at 23, 41.) Although EuroTec performed its work in Canada, EuroTec also shipped parts to New Jersey. (Golanbari Dep. at 44:3–6.) Further, EuroTec employees traveled to New Jersey multiple times to discuss or oversee work performed on Meridian/Liberty helicopters. (Resp. at 5–6.) EuroTec's Vice President, Hossein Golanbari, stated in one email that "we have had a long relationship in providing Liberty Helicopters with the best parts, components and service during the past few years."[2] (Emails at 41.)

---

[2]     In his deposition, Golanbari claimed that this statement was referring, not to Liberty's relationship with Eurotec, but "to the long relationship with our U.S. office, EuroTec Vertical Flight Solutions." (Golanbari Dep. at 80:16–18.) The correctness of that interpretation is far from apparent. In answering the next question in his

## B. The Agreement

In early 2013, Golanbari developed a business relationship with Pat Day, a Liberty employee (Golanbari Dep. at 77:16–25), who came to be "a very good client" (Emails at 41). In late 2013, Day solicited EuroTec's work on a helicopter that he was purchasing. (Golanbari Decl. ¶ 28.) Day and Golanbari negotiated via phone, and Golanbari learned that Meridian would be the record owner of the helicopter. (*Id.* ¶ 31.) Golanbari also knew that the helicopter would be used for tourist flights by New Jersey-based Liberty. (Emails at 12; Golanbari Dep. at 35:19–20.)

Negotiations resulted in an Agreement for EuroTec to install certain after-market parts, including an emergency floatation system. (Compl. ¶ 8.) EuroTec drafted the Agreement and sent it to Chris Vellios, a Liberty employee based in Kearny, as noted by his email signature block. (Emails at 26–28.) The Agreement named Meridian as the co-party and acknowledged that Meridian was based in New Jersey. (Agreement at 1.) Vellios signed on behalf of Meridian. (*Id.* at 1, 9.) The Agreement also contained a "Build Sheet" detailing the work to be done for "Liberty Helicopters." (*Id.*, Attach. A at 1.) Vellios signed this sheet in a signature space for "Liberty Helicopters." (*Id.*, Attach. A at 2.)

There are a few key components of the Agreement:

- Meridian was responsible for transporting the helicopter to/from EuroTec's facility in Ontario, where EuroTec would perform the work. (*Id.* ¶ 7.) EuroTec promised to assist in transport "to / from the United States." (*Id.*)
- EuroTec would perform its work in accordance with Federal Aviation Administration ("FAA") standards. (*Id.* ¶ 6(C).)

---

deposition, Golanbari testified that he "was generalizing in regards to EuroTec." (*Id.* at 80:22–23.) Further, in the email itself, which had a EuroTec Canada signature block, Golanbari endeavored to explain to a third-party "what we do here at *EuroTec Canada* and the different services that we provide for clients like Liberty Helicopters." (Emails at 41 (emphasis added).)

- EuroTec made a limited warranty to make repairs and replacements on the helicopter for, depending on the circumstance, up to two years after delivery. (*Id.* ¶ 27, Attach. C.)

- All communications were to be "in writing and either served personally, by e-mail, by facsimile or by certified mail" to Meridian's New Jersey address. (*Id.* ¶ 15.)

- "This Agreement will be governed by and construed in accordance with the laws of the Province of Ontario and the Service Provider and the Customer hereby agree to the jurisdiction of the Courts of the City of Hamilton, Province of Ontario." (*Id.* ¶ 28.)

- The terms of the Agreement would expire upon delivery. (*Id.* ¶ 4.)

**C. Performance**

Pursuant to the Agreement, Meridian transported the helicopter from its place of purchase in Texas to Ontario, where EuroTec performed the work. (Golanbari Decl. ¶¶ 34–37.) Day picked up the helicopter in Ontario, with Golanbari and other EuroTec employees discussing and coordinating the travel to New Jersey. (*E.g.*, Emails at 9 (Golanbari writing, "We will check weather and plan for the flight to Kearny.").) After the helicopter left Ontario, Golanbari emailed the Liberty team stating, "From the complete EuroTec Family, I would like to thank Liberty Helicopters for their continued business. Our team enjoyed the build and they are looking forward to the next one scheduled . . . . I will follow up with Alain [Alan Martin, a Liberty employee] once the aircraft arrives in Kearny." (Emails at 21.)

After the helicopter arrived in New Jersey, EuroTec billed Meridian for the work by email, and Meridian paid the bill by wire transfer to EuroTec's bank in Ontario. (Golanbari Decl. ¶¶ 34–37.) EuroTec then filed a form with the FAA certifying that it had performed installations according to FAA standards. That certification acknowledged the helicopter's New Jersey registration. (Compl. ¶ 12.) EuroTec did not perform any further work on the floatation

system, but EuroTec did travel to New Jersey in 2014 to oversee work on a transponder also installed as part of the Agreement. (Golanbari Decl. ¶ 42.)

### D. The Accident

Years later, on March 11, 2018, Liberty operated the helicopter on a flight from New Jersey around the New York City area with five passengers and a pilot on board. (Compl. ¶ 22.) While over Manhattan, the helicopter lost power, so the pilot attempted a water landing on the East River. (*Id.* ¶ 23.) He activated the floatation system, but only half the floats inflated. (*Id.* ¶¶ 24, 26.) The helicopter capsized, and the passengers drowned. (*Id.* ¶¶ 27, 32.) Their estates sued Meridian in New York state court. (*Id.* ¶¶ 34–36.)

### E. This Action

In this Court, Meridian sued EuroTec, alleging (1) negligent installation, (2) negligent inspection and certification, (3) breach of contract, (4) breach of the covenant of good faith and fair dealing, (5) breach of express warranty, (6) breach of implied warranty, and (7) negligent misrepresentation. (*Id.* ¶¶ 37–78.) Following jurisdictional discovery (DE 23), EuroTec moves to dismiss (DE 32).

## II.   DISCUSSION

I take up, in turn, EuroTec's grounds for dismissal based on lack of personal jurisdiction (Section II.A), improper venue (Section II.B), and *forum non conveniens* (Section II.C) None supports dismissal.

### A. Personal Jurisdiction

EuroTec argues that this Court lacks personal jurisdiction over it. (Mot. at 10–20.)[3] A federal court may exercise personal jurisdiction over a defendant

---

[3]    On a Rule 12(b)(2) motion, the plaintiff bears the burden of establishing sufficient facts to show that jurisdiction exists. *Marten v. Godwin*, 499 F.3d 290, 295–96 (3d Cir. 2007). Initially, a court must accept the plaintiff's allegations as true and construe disputed facts in favor of the plaintiff. *Pinker v. Roche Holdings, Ltd.*, 292 F.3d 361, 368 (3d Cir. 2002). Where factual allegations are disputed, however, "the plaintiff must sustain its burden of proof in establishing jurisdictional facts through sworn affidavits or other competent evidence." *Patterson v. FBI*, 893 F.2d 595, 603–04 (3d Cir. 1990) (citation omitted). If the district court does not hold an evidentiary

to the extent authorized by state law. Fed. R. Civ. P. 4(k)(1)(A). New Jersey law provides for jurisdiction coextensive with constitutional due process. *Miller Yacht Sales, Inc. v. Smith*, 384 F.3d 93, 96 (3d Cir. 2004) (citing N.J. Ct. R. 4:4-4). Due process allows for general or specific jurisdiction. *Danziger & De Llano, LLP v. Morgan Verkamp LLC*, 948 F.3d 124, 129 (3d Cir. 2020). Meridian concedes that the Court lacks general jurisdiction (Opp. at 11), so I focus on specific jurisdiction.

A court has specific jurisdiction "when the cause of action arises from the defendant's forum related activities." *Chavez v. Dole Food Co.*, 836 F.3d 205, 223 (3d Cir. 2016) (en banc) (citation omitted). Meridian must establish three elements. "First, [EuroTec] must have purposefully directed its activities at the forum. Second, [Meridian's] claims must arise out of or relate to [EuroTec's] activities. And third, exercising personal jurisdiction must not offend traditional notions of fair play and substantial justice." *Danziger*, 948 F.3d at 129–30 (quotation marks, alterations, and citations omitted). The first two elements are often discussed in tandem under the rubric of "minimum contacts."

### 1. Minimum Contacts

Under the first two prongs, a court assesses a defendant's contacts with the forum and their connection to the claims. *Danziger*, 948 F.3d at 129–30. I address the contract claims and then the tort claims.

### a. Contract Claims

For contract claims, "[t]he defendant's contacts with the forum must have been *instrumental* in either the formation of the contract or its breach." *Id.* at 130 (alteration and citation omitted). I "consider the totality of the circumstances," *Telcordia Tech Inc. v. Telkom SA Ltd.*, 458 F.3d 172, 177 (3d

---

hearing, "the plaintiff need only establish a prima facie case of personal jurisdiction." *O'Connor v. Sandy Lane Hotel Co.*, 496 F.3d 312, 316 (3d Cir. 2007). The parties have engaged in jurisdictional discovery and have submitted evidence to the Court. I detect no outcome-significant issues that require an evidentiary hearing, and no party has requested one.

Cir. 2006), and all aspects of the parties' relationship, *Mellon Bank (E.) PSFS Nat'l Ass'n v. Farino*, 960 F.2d 1217, 1224 (3d Cir. 1992). The bottom-line question is whether EuroTec "deliberately has engaged in significant activities within [New Jersey]" or "has created continuing obligations" with Meridian. *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985) (quotation marks and citations omitted).

EuroTec deliberately maintained a substantial relationship with Meridian/Liberty[4] that involved direct contacts with New Jersey and encompassed the Agreement that is alleged to have been breached. EuroTec performed multiple projects for Meridian/Liberty that required travel by EuroTec employees to New Jersey, shipping of parts to New Jersey, and communications sent into New Jersey. (Resp. at 5–6; Golanbari Dep. at 44:3–6.) EuroTec viewed Meridian/Liberty as multi-project, long-term client. (Emails at 23, 41.) One such project was embodied in the Agreement at issue in this case, but this was no fluke, as other mutual projects preceded and succeeded it. Accordingly, EuroTec's efforts to establish and maintain a relationship with New Jersey-based businesses, including direct entries into New Jersey, was instrumental in forming the Agreement.

---

[4]     In its Reply, EuroTec argues that I should ignore EuroTec's contacts with Liberty, as opposed to Meridian. (Reply at 4.) This argument misses the mark in two ways.

First, EuroTec did not make this argument in its opening brief. (*See* Mot. at 13–20.) As an argument raised for the first time in a reply brief, it is not properly before me. *Gap Props., LLC v. Cairo*, Civ. No. 19-20117, 2020 WL 7183509, at *8 (D.N.J. Sept. 17, 2020).

Second, and regardless, EuroTec's argument is not supported by the facts. For starters, the record is clear enough as to Meridian and Liberty's relationship. Meridian serves as record owner, and Liberty as operator with respect to each helicopter, including the one that is the subject of this suit. What is more, there is no evidence that EuroTec ever distinguished between the two entities. (*See* Golanbari Dep. at 25:20–25, 38:13–16, 45:17–46:2; Golanbari Decl. ¶ 31.) EuroTec negotiated with Liberty employees, signed the Agreement with Meridian, and worked with Liberty employees to perform the work. Accordingly, EuroTec has not demonstrated that it dealt with only one, or even that it treated the two as distinct.

EuroTec asks that I focus solely on the Agreement itself, which, in EuroTec's view, has few ties to New Jersey. (Mot. at 18–20.) That focus is perhaps too restricted; I am "not narrowly confined to reviewing the contractual obligations of the parties." *Mesalic v. Fiberfloat Corp.*, 897 F.2d 696, 701 (3d Cir. 1990). Even so, the Agreement itself is sufficiently connected to New Jersey, and in its context even more so. I find five factors significant.

First, given the parties' history and the terms, EuroTec knew that it was dealing with a New Jersey company and that the helicopter would be used in Liberty' charter flight business in New Jersey. *See Mellon Bank*, 960 F.2d at 1223 (weighing that defendants "were all well aware . . . that they were dealing with a Pennsylvania bank"). As a result, EuroTec knew that any failure to adequately perform would lead to "foreseeable injuries" to Meridian/Liberty[5] in New Jersey. *Burger King*, 471 U.S. at 480.

Second, the Agreement contained a warranty that imposed an ongoing obligation upon EuroTec to make repairs and replacements. (Agreement ¶ 27, Attach. C.) Indeed, a EuroTec employee traveled to New Jersey for follow-up work on a part installed as part of the Agreement. (Golanbari Decl. ¶ 42.) The warranty and EuroTec's post-sale work thus reflect "continuing obligations" in New Jersey that support jurisdiction. *Burger King*, 471 U.S. at 476; *see also Mesalic*, 897 F.2d at 700–01 (weighing that an out-of-state boat manufacturer traveled to and performed repairs on a boat after its delivery to the customer in New Jersey); *Eagle Air Transp., Inc. v. Nat'l Aerotech Aviation Del., Inc.*, 75 F. Supp. 3d 883, 890 (N.D. Ill. 2014) (warranty included in aircraft sale agreement plus travel to forum to perform work pursuant to the warranty supported jurisdiction).

Third, EuroTec exchanged email and telephone communications regarding this Agreement with Liberty employees, whom EuroTec must have

---

[5]   I deal here with the claims as between EuroTec and Meridian. Injuries to passengers, of course, are another matter, and have been deal with in separate litigations.

known to be New Jersey-based, and EuroTec sent its bill to Meridian in New Jersey. (*See* Golanbari Decl. ¶¶ 31, 37; Emails at 9, 21, 28.) *See Telcordia*, 458 F.3d at 177–78 (weighing whether communications were sent to the forum and where payments were made). In fact, the Agreement obligated EuroTec to send communications to Meridian's New Jersey address. (Agreement ¶ 15.) The Agreement thus expressly contemplated contacts with New Jersey. *See Burger King*, 471 U.S. at 480 (weighing that the contract "envisioned" contacts with the forum).

Fourth, although EuroTec's performance and delivery occurred in Ontario, the Agreement required EuroTec to assist with transport to/from New Jersey, and EuroTec did so. (Agreement ¶ 7; Emails at 9, 21.) Again, there was a "deliberate assumption" by EuroTec of an obligation that required contact with New Jersey. *Gen. Elec. Co. v. Deutz AG*, 270 F.3d 144, 151 (3d Cir. 2001).

Fifth, the Agreement provided that EuroTec would perform its work in accordance with FAA requirements, and EuroTec so certified to the FAA. (Agreement ¶ 6(C); Compl. ¶ 12.) A key consideration for exercising jurisdiction is whether it is reasonable to subject the defendant to litigation in the forum. That the defendant agreed to perform according to forum law tends to show reasonableness. *See Burger King*, 471 U.S. at 476 (where the defendant "has availed himself of the privilege of conducting business there, and because his activities are shielded by the benefits and protections of the forum's laws it is presumptively not unreasonable to require him to submit to the burdens of litigation in that forum" (quotation marks and citation omitted)); *Remick v. Manfredy*, 238 F.3d 248, 256 (3d Cir. 2001) (contract's provisions were required by the Pennsylvania law, "suggesting that [the defendant] was receiving the benefit of Pennsylvania law"). Now FAA standards are not, of course, forum law in the sense of New Jersey law, but they do apply in New Jersey, and they do not apply in Canada. Accordingly, EuroTec's submission to FAA law means that EuroTec might reasonably anticipate litigation here is its failure to meet FAA standards rendered Meridian's aircraft non-compliant.

Indeed, one contract claim here is based on EuroTec's alleged non-compliance with FAA standards. (Compl. ¶ 62.) Put differently, complying with FAA standards was one prerequisite to doing business in New Jersey, so the fact that EuroTec agreed to comply tends to show purposeful availment. At a minimum, the Agreement's invocation of FAA standards shows that the Agreement is not as Canada-centric as EuroTec claims. *See generally Glob. Commodities Trading Grp., Inc. v. Beneficio de Arroz Choloma, S.A.*, 972 F.3d 1101, 1108 (9th Cir. 2020) (weighing that foreign company purchased goods made according to American standards).

These are facts that suggest jurisdiction, but EuroTec points to others. Individually or in combination, they do not outweigh the facts outlined above.

First, EuroTec argues that Meridian reached out to EuroTec to arrange the work. (Mot. at 15.) It is not so important, however, to identify the party which initiated the transaction; "the intention to establish a common venture extending over a substantial period of time is a more important consideration." *Gen. Elec.*, 270 F.3d at 151. What is significant here is the parties' bilateral, multi-project relationship, not the fact that Meridian initiated this project. Next, EuroTec argues that no employees traveled to New Jersey to negotiate this Agreement or to work on the specific flotation system that failed in the accident. (Mot. at 18–19.) But when "long-term relationships have been established, actual territorial presence becomes less determinative." *Gen. Elec.*, 270 F.3d at 151. EuroTec's prior contacts with New Jersey helped establish this relationship, and the Agreement was part of that relationship; that this Agreement perhaps involved less New Jersey travel than others is not very significant in context. Finally, EuroTec argues that performance, delivery, and the alleged breach occurred in Ontario. (Mot. at 15–16, 19.) But the Supreme Court "rejected the notion that personal jurisdiction might turn on . . . the place of contracting or of performance." *Burger King*, 471 U.S. at 479 (citation omitted). Nor is the question one of identifying the forum with the *most* contacts. Looking at all aspects of the contract and relationship, there were

10

*sufficient* contacts and obligations to permit this Court to exercise personal jurisdiction with respect to the contract claims.

In sum, it was reasonable for EuroTec to expect that this transaction, in the context of the parties' relationship, would expose it to litigation in New Jersey for disputes over the Agreement. Thus, I have personal jurisdiction with respect to claims for breaches of the Agreement.

### b.  Tort Claims

I next assess the connection between EuroTec's New Jersey contacts and the tort claims. For tort claims, the contacts and the claims must have "a closer and more direct causal connection" than but-for causation. *Danziger*, 948 F.3d at 120. The but-for connection is, however, a starting point, and it is present here. But for EuroTec's efforts to develop a relationship with Meridian, which included actions in New Jersey, EuroTec would not have performed the work which Meridian alleges was negligent.

Exploring further, I find that the connections among EuroTec, New Jersey, and the tort claims are multiple. EuroTec performed custom work on New Jersey-based chattel, to Meridian's specifications. EuroTec knew that the helicopter would fly in New Jersey and needed to meet U.S. standards imposed by the FAA. EuroTec was entrusted with New Jersey property, and duties of care specifically arose from its knowledge of how that property would be used in New Jersey. *See G.A.-H. v. K.G.G.*, 210 A.3d 907, 914–15 (N.J. 2019) (describing when duties arise for negligence claims). At bottom, this case does not involve the simple sale of a commercial commodity at arm's length to a customer in New Jersey; rather, EuroTec undertook to perform services individualized for a New Jersey resident and long-term customer, and performed that work on New Jersey-based property. *Compare Bristol-Myers Squibb Co. v. Super. Ct. of Cal., S.F. Cnty.*, 137 S. Ct. 1773, 1780 (2017) (no jurisdiction in California over New York/New Jersey-based pharmaceutical company for claims relating to a drug sold nationwide), *with Liberty Mut. Fire Ins. Co. v. Menozzi Luigi & C. S.p.A.*, 92 F. Supp. 3d 435, 442 (E.D. Va. 2015)

(jurisdiction in Virginia over Italian company for building a customized rack system), *and Pyrotek, Inc. v. Motionmaster, Inc.*, No. 1:04CV00549, 2006 WL 8430244, at *4 (M.D.N.C. Feb. 22, 2006) (jurisdiction in North Carolina over California company for building custom equipment).

Most of EuroTec's cited cases, then, are inapposite, because they do not involve the deep relationship, custom work, substantial property, or foreseeability that are at play here. The most applicable is *Kraut v. Raisbeck Engineering, Inc.*, No. A-4336-09T2, 2011 WL 3586136 (N.J. Super. Ct. App. Div. Aug. 17, 2011) (per curiam), but it is distinguishable. (Mot. at 17–18.)[6] In *Kraut*, a New Jersey resident owned a plane which he used to fly to and from his South Carolina vacation home. On a few occasions, he stopped along the way at a North Carolina facility for repairs. When the plane later crashed, he sued the North Carolina facility in New Jersey, alleging that its negligent work was to blame. 2011 WL 3586136, at *1–2. The Appellate Division held that there was no jurisdiction over the North Carolina facility in New Jersey because (1) the facility did not even know the plaintiff was a New Jersey resident, (2) the plaintiff became a customer by virtue of his own decision to stop over in North Carolina, and (3) the relationship did not extend beyond the plaintiff's stopovers in North Carolina. *Id.* at *9.

Here, in contrast, Meridian did not merely descend on EuroTec from the sky. Rather, (1) EuroTec knew it was servicing a New Jersey helicopter and customer, (2) EuroTec's relationship with Meridian was not one-directional, as EuroTec made ongoing efforts to receive Meridian's business, and (3) the relationship involved direct contacts by EuroTec with New Jersey, including communications and visits. The relationship between the customer and service provider here is much more connected to New Jersey than the one in *Kraut*.

---

[6]     As a threshold matter, *Kraut* has little force because (1) the due-process test is a question of federal law, *see Surrick v. Killion*, 449 F.3d 520, 535 (3d Cir. 2006), and (2) unpublished Appellate Division opinions do not bind me in any event, *Durr Mech. Constr., Inc. v. PSEG Fossil, LLC*, Civ. No. 18-10675, 2021 WL 303030, at *3 (D.N.J. Jan. 29, 2021) (citations omitted).

Thus, I conclude that this Court may assert specific jurisdiction over EuroTec in connection with the tort claims.

### 2. Fair Play and Substantial Justice

Having found minimum contacts, I consider whether "traditional notions of fair play and substantial justice" nevertheless prevent the court from exercising jurisdiction. Because EuroTec does have the necessary contacts with New Jersey, EuroTec cannot escape personal jurisdiction unless it presents "a compelling case that the presence of some other considerations would render jurisdiction unreasonable." *Carteret Sav. Bank, FA v. Shushan*, 954 F.2d 141, 150 (3d Cir. 1992) (quoting *Burger King*, 471 U.S. at 477). EuroTec devotes only a paragraph to this prong (Mot. at 21), and courts in this District have generally denied motions to dismiss when the defendant offers no substantial argument. *W. Coast Life Ins. Co. v. Wells Fargo Bank, N.A.*, Civ. No. 20-04350, 2021 WL 302919, at *7 (D.N.J. Jan. 29, 2021) (collecting cases).

Regardless, there is no compelling case here for declining to exercise jurisdiction. As potential countervailing factors, I consider (1) EuroTec's burden, (2) New Jersey's interest, (3) Meridian's interest, (4) efficiency, and (5) other forums' interests. *Carteret*, 954 F.2d at 150 (citing *Burger King*, 471 U.S. at 477). First, although EuroTec is a foreign company, its burden is perhaps not quite as severe as that of other foreign defendants. EuroTec is a 50% owned subsidiary of an American company. (Golanbari Dep. at 12:20–13:1, 29:19–24.) Consulting a map, I observe that EuroTec is located 40 miles southwest of Toronto, and 75 miles northwest of Buffalo, New York. Directions from Toronto, ON to 12 Innovation Dr, Dundas, ON L9H 7P3, Google Maps, http://maps.google.com; Driving Directions from Buffalo, NY to 12 Innovation Dr, Dundas, ON L9H 7P3, Google Maps, http://maps.google.com. Flights from Toronto to Newark occupy less than two hours. Flights from Toronto, ON to Newark, NJ, Google Maps, http://maps.google.com; *cf. Laurel Gardens, LLC v. Mckenna*, 948 F.3d 105, 122–23 (3d Cir. 2020) (finding it reasonable to exercise jurisdiction "over defendants from a neighboring state"). EuroTec personnel

have traveled to New Jersey multiple times over the past decade, suggesting that, where profit was to be had, travel was not considered so burdensome. Finally, EuroTec has already engaged in jurisdictional and related discovery, without any indication of undue difficulty or burden. (*See* DE 22.) *See Carteret*, 954 F.2d at 150 (considering that discovery had already been conducted).

On the second and third factors, Meridian has an obvious interest in proceeding with this case in its home forum. New Jersey likewise has a "manifest interest" in providing redress for its residents. *Id.*

On the fourth and fifth factors, resolving this dispute in New Jersey would be efficient to the extent that the plaintiff and its witnesses are located here. EuroTec's witnesses, of course, are likely to be Ontario-based, and Ontario has a mirror-image policy interest in deciding cases that define the duties imposed on its residents. No other forum's interests seem to be in play.

To offset the minimum contacts analysis, there would need to be a *compelling* case of fairness for choosing Ontario over New Jersey. Here, there is not.

* * *

Meridian has made the necessary showing for an exercise of specific jurisdiction over EuroTec. EuroTec's motion to dismiss for lack of personal jurisdiction is denied.

### B. Improper Venue

EuroTec argues that the Complaint should be dismissed because venue is improper. (Mot. at 21–26.)[7] I find, however, that venue is proper under at least one provision, 28 U.S.C. § 1391(b)(2).

---

[7]     On a Rule 12(b)(3) motion, the Court accepts the complaint's well-pled factual allegations as true unless contradicted by the defendant's affidavits. *Shah v. Centurum, Inc.*, Civ. No. 10-2015, 2011 WL 1527334, at *2 (D.N.J. Apr. 20, 2011). The Court also considers evidence outside of the complaint because "generally, it is not necessary for the plaintiff to include allegations in his complaint showing that venue is proper." *Boston Sci. Corp. v. Cook Grp. Inc.*, 269 F. Supp. 3d 229, 234–35 (D. Del. 2017) (citations omitted).

The Complaint properly relies on § 1391(b)(2) as the source of venue. (Compl. ¶ 5.) Subsection (b)(2) provides that "[a] civil action may be brought in . . . a judicial district in which a substantial part of the events or omissions giving rise to the claim occurred." "Substantial part" "does not require a majority of the events to take place here, nor that the challenged forum be the best forum for the lawsuit to be venued." *Ragner Tech. Corp. v. Berardi*, 287 F. Supp. 3d 541, 556 n.10 (D.N.J. 2018) (citation omitted).

For contract claims, courts consider "where the contract was negotiated or executed, where the contract was to be performed, and where the alleged breach occurred." *Ferratex, Inc. v. U.S. Sewer & Drain, Inc.*, 121 F. Supp. 3d 432, 438 (D.N.J. 2015) (citation omitted). Meridian negotiated while in New Jersey, and EuroTec directed all its communications relating to the Agreement to New Jersey-based employees. *See U.S. Titan, Inc. v. Guangzhou Zhen Hua Shipping Co.*, 241 F.3d 135, 153–54 (2d Cir. 2001) (communications sent to forum support finding of proper venue). Most of Meridian's performance was New Jersey-based; it wired payment from New Jersey and traveled to and from New Jersey to pick up the helicopter. Part of EuroTec's performance also took place in New Jersey; it oversaw follow-up work here. Thus, while EuroTec's work on the helicopter and the alleged breach occurred in Ontario, a substantial part of the Agreement nevertheless involved New Jersey. *Ferratex*, 121 F. Supp. 3d at 438–39 (finding a substantial part of a contract claim occurred in New Jersey even though "a larger portion of the performance" occurred elsewhere).

For tort claims, courts have not spelled out the relevant factors as clearly, but, at bottom, "it is necessary to look at the nature of the dispute." *Cottman Transmission Sys., Inc. v. Martino*, 36 F.3d 291, 295 (3d Cir. 1994). This dispute is one over the modification and operation of a New Jersey-based helicopter. Although both the modification and the accident occurred outside New Jersey, this case at all times involved a New Jersey-based helicopter. Moreover, a central event giving rise to this case—the accident—occurred on a

flight that departed from New Jersey (albeit after it had crossed the state line to nearby New York City). Other events, too, were New Jersey-based: Meridian communicated from New Jersey its requirements for the work done on the helicopter, thus coloring the duty that arose and forms the foundation of the negligence claims.

A substantial part of the events giving rise to the tort claims occurred in New Jersey, and venue is proper under 28 U.S.C. § 1391(b)(2).[8] EuroTec's motion to dismiss for improper venue is therefore denied.

## C. Forum Non Conveniens

EuroTec argues that I should dismiss the case on *forum non conveniens* grounds because the Agreement contains a forum selection clause specifying the city courts of Hamilton, Ontario. (Mot. at 26–31.)[9] *Forum non conveniens* requires a decision whether a case "should be adjudicated elsewhere," *Sinochem Int'l Co. v. Malaysia Int'l Shipping Corp.*, 549 U.S. 422, 432 (2007), and "is the proper mechanism for enforcing a forum selection clause," *Collins v. Mary Kay, Inc.*, 874 F.3d 176, 180 (3d Cir. 2017).

Ordinarily, a district court employs a four-factor test to determine whether to dismiss on grounds of *forum non conveniens* (discussed further, *infra*). *Id.* at 186. When the parties' contract has a valid, mandatory forum-selection clause, however, such a clause is generally "given controlling weight."

---

[8]    It is therefore unnecessary to consider alternative theories of venue. They do exist, however, and the court is not confined to the statutory venue provisions cited in the complaint. *Fox v. Patterson*, No. 10-CV-6240, 2010 WL 11545717, at *6 (W.D.N.Y. May 13, 2010); *Jasper v. City of San Antonio*, Civ. No. 07-04118, 2008 WL 4572533, at *1 (D.N.J. Oct. 14, 2008); *see Great W. Min. & Mineral Co. v. ADR Options, Inc.*, 434 F. App'x 83, 86–87 (3d Cir. 2011). Under the catchall provision of 28 U.S.C. § 1391(b)(3), where venue is not proper in any U.S. district, the suit may be brought in any district in which a defendant is subject to personal jurisdiction. Under 28 U.S.C. § 1391(c)(3), a defendant not resident in the U.S. may be sued in any district. As backups, assuming (b)(2) did not apply, these theories would seem to fit.

[9]    *Forum non conveniens* dismissal is committed to the district court's discretion, but the defendant bears the burden at every step of the analysis. *Delta Air Lines, Inc. v. Chimet, S.p.A.*, 619 F.3d 288, 295 (3d Cir. 2010).

*Atl. Marine Constr. Co. v. U.S. Dist. Ct.*, 571 U.S. 49, 60 (2013). Still, the court must find that the forum selection clause does in fact *mandate* that disputes be brought in a certain forum. As a threshold issue, then, I must determine whether the clause here mandates, or merely permits, an Ontario court to take jurisdiction. *Networld Commc'ns, Corp. v. Croatia Airlines, D.D.*, Civ. No. 13-4770, 2014 WL 4724625, at *2 (D.N.J. Sept. 23, 2014); *BAE Sys. Tech. Sol. & Servs., Inc. v. Republic of Korea's Def. Acquisition Program Admin.*, 884 F.3d 463, 471 (4th Cir. 2018) (collecting cases from various courts of appeals agreeing on this framework); *see Wall v. Corona Cap., LLC*, 756 F. App'x 188, 191–92 (3d Cir. 2018) (holding that the district court conducted the proper test when it first concluded that a forum selection clause was permissive and then analyzed the unmodified *forum non conveniens* factors).

I first interpret the forum selection clause, and find it to be permissive, not mandatory. (Section II.C.1) There being no dispositive contractual mandate, I apply the four *forum non conveniens* factors, and find that they weigh in Meridian's favor. (Section II.C.2)

### 1. Interpreting the Forum Selection Clause

Meridian argues that the clause (1) has expired and (2) is permissive. (Opp. at 24–26.) I discuss each argument in turn, but before doing so I must decide what law governs.

### a. Applicable Law

"A court considering the interpretation of a forum selection clause applies principles of contract law . . . ." *Collins*, 874 F.3d at 180. State or foreign law may govern interpretation of a forum selection clause. *See id.* at 183.[10] To decide which state's or country's law applies, I "look to the choice-of-

---

[10]    In *Collins*, the Third Circuit held that state contract law applies when interpreting a forum selection clause. 874 F.3d at 183. Although *Collins* did not address whether foreign law could also govern interpretation, *Collins* relied on opinions from the Fifth and Second Circuits that used the same reasoning to conclude that foreign law applied to a selection clause. *Weber v. PACT XPP Techs., AG*, 811 F.3d

law rules of the forum state . . . , even where the contract contains a choice-of-law clause." *Id.* In New Jersey, the courts will enforce a contract's choice-of-law. *Id.* at 183–84 (citation omitted).[11]

The Agreement provides that Ontario law applies to its construction. (Agreement ¶ 28.) Under New Jersey choice-of-law rules, Ontario law would apply. Still, "foreign law is treated as a fact that must be proven." *Abdille v. Ashcroft*, 242 F.3d 477, 490, n.10 (3d Cir. 2001). EuroTec has not provided Canadian law or pointed to any true conflict, *i.e.*, a consequential difference between Ontario law and that of New Jersey. When parties fail to provide foreign law, a court may apply general contract-law principles or forum law. *Williams v. Medley Opportunity Fund II, LP*, 965 F.3d 229, 238–39 (3d Cir. 2020) (acknowledging the applicability of tribal law to arbitration agreement but applying forum law because the parties did not provide tribal law); *John Wyeth & Brother Ltd. v. CIGNA Int'l Corp.*, 119 F.3d 1070, 1074 (3d Cir. 1997) (acknowledging applicability of English law to forum selection clause but applying general contract law because the parties did not provide English law); *cf. McCarrell v. Hoffman-La Roche, Inc.*, 153 A.3d 207, 216 (N.J. 2017) (first step in choice-of-law analysis is whether a "true conflict" exists; when none appears, the forum's law governs).

I will therefore default to general contract law, especially as recognized by New Jersey courts.

### b. Expiration

At the outset, Meridian argues that the Agreement has expired, and so has the forum selection clause, which therefore has no effect. (Opp. at 25.) The

---

758, 773 (5th Cir. 2016); *Martinez v. Bloomberg LP*, 740 F.3d 211, 223–24 (2d Cir. 2014). The possibility of foreign law, then, cannot be ruled out.

[11]    To be sure, a choice-of-law clause will not be respected in limited circumstances. *Collins*, 874 F.3d at 184. Because the parties have not briefed the question of whether any of those exceptions apply, I will assume they do not. *See id.* at 184 n.6, n.7 (declining to find that the exceptions applied when the parties had not adequately explained their application).

Agreement provides that "the term of this Agreement . . . shall terminate on the Delivery Date, except for any provisions that may survive by their terms." (Agreement ¶ 4.) Because the delivery date has passed, Meridian reasons that it is no longer bound by the forum selection clause.

The weight of authority is against Meridian. True, the expiration of a contract may release parties from their obligations to perform. *Litton Fin. Printing Div. v. NLRB*, 501 U.S. 190, 206 (1991). Still, this Agreement's termination provision excepts "provisions that may survive by their terms." Courts have recognized that forum selection clauses are the kinds of terms that ordinarily survive expiration, absent specific language otherwise.[12] A forum selection is not an ordinary allocation of contractual duties, but an expression of mutual intent that disputes be decided in a certain way. Absent other considerations, the courts will not disregard that intent based only on the date the suit was brought. *E.g.*, *Future Sanitation, Inc. v. Se. Personnel Leasing, Inc.*, Civ. No. 17-06544, 2017 WL 5707532, at *2 (D.N.J. Nov. 27, 2017); *Silverpop Sys., Inc. v. Leading Mkt. Techs., Inc.*, 641 F. App'x 849, 857–58 (11th Cir. 2016).

In the Agreement, there is no language specifically indicating that the forum selection clause was meant to expire, and common sense suggests that it was not. I therefore hold that that the forum selection clause is not barred at

---

[12]   Where an executory contract has expired, it may be self-evident that the parties' duties of performance no longer apply. Here, however, although the Agreement terminated on delivery, certain duties were inherently ongoing—EuroTec, for example, warranted its work for up to two years and continued to perform repairs and adjustments.

Similarly, it makes little sense to say that the forum selection clause expired on delivery—*i.e.*, that it governs only lawsuits arising from the work on the helicopter that are filed *before* the work was done. Virtually any contracting party would understand that a suit for damages is commonly brought *because* the contract is no longer in effect—often because it has been breached. Stated differently, most suits occur after delivery because that is when the customer discovers that the product does not conform to the contract or is defective for some other reason.

the outset, and still applies, at least potentially. I therefore move on to construe the forum selection clause.

### c. Mandatory vs. Permissive

The parties disagree over whether the Agreement's forum selection clause is mandatory or permissive. "A permissive clause authorizes jurisdiction in a designated forum but does not prohibit litigation elsewhere, whereas a mandatory clause . . . dictates an exclusive forum for litigation under the contract." *Dawes v. Pub. Am. LLLP*, 563 F. App'x 117, 118 (3d Cir. 2014). Clauses that only specify a forum are treated as permissive. To be regarded as mandatory, a clause must include "some further language indicating the parties' intent to make jurisdiction exclusive." *Union Steel Am. Co. v. M/V Sanko Spruce*, 14 F. Supp. 2d 682, 687 (D.N.J. 2008) (citation omitted).

The forum selection clause here is part of a longer sentence—more about that later—but I first consider it in isolation. The Agreement states that Meridian and EuroTec "agree to the jurisdiction of the Courts of the City of Hamilton, Province of Ontario." (Agreement ¶ 28.) The plain language of that clause does not provide that disputes can be brought *only* in Ontario. It lacks the hallmarks of a mandatory clause, such as a requirement that disputes "*shall be* submitted to the jurisdiction of [particular] courts," *Collins*, 874 F.3d at 179, 185 n.8 (emphasis added), or "the terms 'exclusive,' 'sole,' or 'only,'" *K & V Sci. Co. v. BMW*, 314 F.3d 494, 500 (10th Cir. 2002) (collecting cases). Instead, this clause merely specifies that the parties agree to submit to the jurisdiction of the city courts of Hamilton, Ontario. Such permissive clauses are commonly used to "establish[] at least one agreed-upon place to bring a claim." *D & S Consulting, Inc. v. Kingdom of Saudi Arabia*, 961 F.3d 1209, 1213 (D.C. Cir. 2020). This clause, too, guarantees at least one viable

forum and guards against a party's assertion that it cannot be sued anywhere. But that is not the same thing as requiring Meridian to litigate in Ontario.[13]

The late Judge Dickinson R. Debevoise of this District held that near-identical language was permissive. *Lodge v. Mayline Co.*, Civ. No. 10-4100, 2010 WL 4853642, at *8 (D.N.J. Nov. 19, 2010). What is more, courts across the country have interpreted similar "agree to the jurisdiction of" language to be permissive.[14] Persuasive authority, then, confirms my reading.

In response, EuroTec argues that the verb "will" is used in the sentence containing the forum selection clause, and that "will" is closely akin to "shall," a common indicator of mandatory status. (Reply at 12–13.) Whether "will" and "shall" are synonyms, however, is beside the point, because the auxiliary verb "will" is not associated with the agreement to submit to the jurisdiction of the court in Ontario.[15]

---

[13]     At best, the language of the clause is ambiguous and thus would be construed against the drafter (EuroTec) as permissive. *K & V.*, 314 F.3d at 500–01 (collecting cases).

[14]     *E.g.*, *Pace Constr. Co. v. McKinney Drilling Co.*, No. 4:16-cv-00455, 2016 WL 2594072, at *2 (E.D. Mo. May 5, 2016) ("The parties consent and agree to the jurisdiction of the Circuit Court of St. Louis County, Missouri"); *Singley Constr. Co. v. Orso*, No. 2:15-CV-164, 2016 WL 750662, at *1 (S.D. Miss. Feb. 24, 2016) ("Employee hereby agrees to the jurisdiction of Marion County, Mississippi, Chancery Court"); *Hazim v. Schiel & Denver Pub. Ltd.*, No. H-12-1286, 2015 WL 4545534, at *5 (S.D. Tex. July 28, 2015) ("[T]he parties hereto submit and agree to the jurisdiction of the State of Texas courts"), *aff'd*, 647 F. App'x 455 (5th Cir. 2016); *Adgate v. Chip Shoppe, Inc.*, No. 13-C-163, 2013 WL 6981451, at *8 (E.D. Wisc. May 10, 2013) ("Contractor expressly agrees to the jurisdiction of federal and state courts in Minnesota").

[15]     As used here, "will" serves as an auxiliary verb. EuroTec is not wrong to argue that, in that mode, shall and will are equivalent. Initially, that position appears to be in some tension with Strunk & White's well-known prescription:

> **Shall, Will**. In formal writing, the future tense requires shall for the first person, will for the second and third. The formula to express the speaker's belief regarding a future action or state is I shall; I will expresses determination or consent. A swimmer in distress cries, "I shall drown; no one will save me!" A suicide puts it the other way: "I will drown; no one shall save me!" In relaxed speech, however, the words shall and will are seldom used precisely; our ear guides us or fails to

EuroTec's interpretation glosses over the structure of the sentence containing the forum selection clause. I reproduce it here with bracketed numbers and line breaks added:

> "[1] This Agreement will be governed by and construed in accordance with the laws of the Province of Ontario
>
> and
>
> [2] the Service Provider and the Customer hereby agree to the jurisdiction of the Courts of the City of Hamilton, Province of Ontario."

(Agreement ¶ 28.)

---

guide us, as the case may be, and we are quite likely to drown when we want to survive and survive when we want to drown.

William Strunk, Jr. & E.B. White, The Elements of Style 58 (3d ed. 1979). (Of course, for the semi-aquatic grammarian who wishes both to be rescued and to "omit needless words," the clear choice would be "Help!")

But Strunk & White's advice regarding shall and will, even as tempered by common usage, might require updating:

> The authors of *Merriam-Webster's Dictionary of English Usage*, having surveyed the uses of the two forms over six hundred years, conclude, "The traditional rules about shall and will do not appear to have described the real usage of these words precisely at any time, although there is no question that they do describe the usage of some people some of the time, and that they are more applicable in England than elsewhere."

Steven Pinker, The Sense of Style 227 (2014). Professor Pinker implies that the distinction may disappear, if only because "shall" may die out altogether. *Id.* at 228 ("[N]o one says *I shall pick up the toilet paper at Walmart this afternoon.*"). In everyday English, perhaps; "shall" may survive, however, in the field of legal drafting, which tends to retain antiquated locutions that have come to stand for fixed concepts (and is less concerned about sounding fussy, or like a character in *Game of Thrones*).

More generally, although courts, including some of the ones cited herein, have treated Strunk & White as authoritative regarding grammar (as opposed to style), not everyone agrees. A persuasive, if intemperate, take from an authoritative source is G. K. Pullum, "50 Years of Stupid Grammar Advice," The Chronicle Review (April 17, 2009), https://www.semanticscholar.org/paper/50-years-of-stupid-grammar-advice-Pullum/7c6c3a370244c33c3bb5952c3f4af55996ecc3b4 (2009).

The sentence comprises two independent grammatical clauses (designated [1] and [2]), joined by the conjunction "and".[16] If the "and" were replaced by a period, there would be no change in meaning or effect. "An independent clause is one that can stand by itself—*i.e.*, is a simple sentence" with a subject and verb. *Barton v. Mid-Atl. Flooring Ventures*, Civ. No. 13-4592, 2014 WL 6885976, at *1 n.3 (D.N.J. Dec. 4, 2014). Courts tend to interpret independent clauses as, well, independent. *See, e.g.*, *Patel v. Zillow, Inc.*, No. 17-CV-4008, 2017 WL 3620812, at *5 (N.D. Ill. Aug. 23, 2017), *aff'd*, 915 F.3d 446 (7th Cir. 2019); *Banterra Bank v. Hendrick*, No. 5:09-CV-00012, 2009 WL 3231359, at *4 (W.D. Ky. Oct. 1, 2009). Following that approach, I conclude that the "will" in the first clause (dealing with choice of law) has no effect on the second clause (dealing with consent to jurisdiction).

The subject of the first independent clause is the noun, or noun phrase (NP) "This Agreement"; the associated verb, or verb phrase (VP), is "will be governed by and construed . . . ." The subject of the second independent clause is "the Service Provider and the Customer"; the associated verb is "agree." The Agreement isn't going to "agree," and the Service Provider and the Customer aren't going to be "construed." Rather, the Agreement "will" be construed under

---

16      A comma before "and the Service Provider" would be preferable. *See* William Strunk, Jr. & E.B. White, The Elements of Style 10–12 (2011 ed.); Hamilton Coll. Writing Ctr., *The Second Deadly Sin: Incorrect Punctuation of Two Independent Clauses* (last visited Feb. 22, 2021), https://www.hamilton.edu/academics/centers/writing/seven-sins-of-writing/2; GrammarBook, *Connecting Sentences with Commas and Semicolons* (last visited Feb. 22, 2021), https://www.grammarbook.com/blog/commas/connecting-sentences-with-commas-and-semicolons/. But comma or no, each of these clauses has its own subject and verb, and the two are clearly independent. Practical online introductions to independent and dependent clauses may be found at, *e.g.,* Grammar Untied, *Clauses: Independent* (Nov. 15, 2011), http://www.grammaruntied.com/blog/?p=1187; Purdue Online Writing Lab, *Identifying Independent and Dependent Clauses* (last visited Feb. 22, 2021), https://owl.purdue.edu/owl/general_writing/punctuation/independent_and_dependent_clauses/index.html.

Ontario law, and the parties "agree" to submit to the jurisdiction of the Ontario courts. "Will" is a modal auxiliary to the verbs "governed" and "construed." There is no sensible basis to conclude that "will" serves as an auxiliary to the verb "agree."

The language of the first clause, then, is mandatory (if "will" means "shall"), but the language of the second is not. Nor is there anything unusual about one clause being mandatory and the other not. *Cf. State v. Regis*, 32 A.3d 1109, 113–14 (N.J. 2011) (when "shall" is used twice, a statute creates two legal mandates, but when "shall" is used once, it creates only one legal mandate (citation omitted)); *Cancer Genetics, Inc. v. Kreatech Biotech., B.V.*, Civ. No. 07-273, 2007 WL 4365328, at *5 (D.N.J. Dec. 11, 2007) (Greenaway, J.) (choice-of-law clause could be mandatory while the forum selection clause was permissive). Put differently, the two clauses are grammatically distinct; each has its own subject and verb; and the verb in the first clause does not carry over to the second. These clauses function as independent adults living under the same roof.

EuroTec cites *Wall Street Aubrey Golf, LLC v. Aubrey*, 189 F. App'x 82 (3d Cir. 2006). *Aubrey* interpreted a forum selection clause which provided that "[t]his Lease shall be construed in accordance with the laws of the Commonwealth of Pennsylvania, with venue laid in Butler County, Pennsylvania." *Id.* at 85. The court held that venue clause was mandatory, reasoning that it "cannot read the subordinate venue provision in isolation from the preceding mandatory clause: the mandatory 'shall' in '[t]his Lease *shall* be construed in accordance with [Pennsylvania law]' necessarily encompasses the latter 'with venue laid in Butler County.'" *Id.* at 186. That sentence is grammatically distinct from the one here; by contrast, it actually illustrates the point I am making. In *Aubrey,* the venue provision is a dependent, not an independent, clause. The second, dependent venue clause does not have its own verb; it complements the verb "shall" in the first clause, and partakes of its mandatory nature. In this case, by contrast, the

Agreement's forum selection clause is independent and is therefore distinguishable from the subordinate or dependent clause in *Aubrey*.

Indeed, it was on just those grounds that the Third Circuit itself later distinguished *Aubrey* and held that "the choice-of-law and the forum selection provisions were separate and independent." 756 F. App'x at 191 n.4. The *Wall* contract contained independent but contiguous clauses which provided that "this Agreement shall be governed by" New Jersey law, and that "the parties agree that venue lies" in New Jersey. *Id.* at 190. The language is parallel to that of the Agreement in every way that matters. To be sure, those provisions were in succeeding sentences—*i.e.*, they were separated by a period, not by an "and." Structurally, however, the distinction makes no difference. Such independent clauses can be separated by a period; alternatively, they can be conjoined with a semicolon or a connecting word, such as "and" or "but." Critical to the reasoning of *Wall* was that the "provisions were separate and independent," just as they are in the Agreement here.

I have delved, perhaps too much, into matters of grammar and the options for conveying meaning *via* independent or dependent clauses. Sensitive writers in various disciplines may choose one mode or the other based upon, *e.g.*, the flow of the prose or the closeness of the relationship between the thoughts expressed in the two clauses. In contract law, however, useful and predictable rules of interpretation have grown up; such prosodic subtleties will not be permitted to override straightforward grammatical structure. Any residual argument that "will" in the first independent clause somehow tinges the sense of the entire sentence is too weak a basis for a conclusion that the second, independent forum selection clause is mandatory.

The forum selection clause is permissive.

### 2. Forum Non Conveniens Factors

Because the forum selection clause is not mandatory, I apply the more general doctrine of *forum non conveniens*. *E.g.*, *Networld*, 2014 WL 4724625, at *2. Under that doctrine, "a plaintiff's choice of forum should rarely be

disturbed." *Kisano Trade & Invest Ltd. v. Lemster*, 737 F.3d 869, 873 (3d Cir. 2013). Nonetheless, when proceeding in the plaintiff's chosen forum "would establish oppressiveness and vexation to a defendant out of all proportion to plaintiff's convenience," a court may dismiss a case on grounds of *forum non conveniens*. *Id.* (quotation marks and citations omitted).

> The relevant inquiry is fourfold:
>
> (1) the amount of deference to be afforded to plaintiffs' choice of forum;
>
> (2) the availability of an adequate alternative forum where defendants are amenable to process and plaintiffs' claims are cognizable;
>
> (3) relevant "private interest" factors affecting the convenience of the litigants; and
>
> (4) relevant "public interest" factors affecting the convenience of the forum.

*Collins*, 874 F.3d at 186 (citation omitted; line breaks added).

### a. Plaintiff's Choice of Forum

Under the first factor, different classes of plaintiffs receive different levels of deference, and that deference in turn affects how strong the showing on the other factors must be. *See Kisano*, 737 F.3d at 873–74. "The focus of the deference inquiry . . . is on convenience"; if the plaintiff's chosen forum is convenient for him or her, it is entitled to deference. *Id.* at 875. Ordinarily, when a domestic plaintiff sues in his or her home state, that choice receives great deference, and will not be displaced unless the remaining factors "clearly favor[] an alternate forum." *Id.* (citation omitted). When the plaintiff has agreed to a permissive forum selection clause, however, it has indicated at least a general willingness to litigate elsewhere, and the courts may afford less deference. *Networld*, 2014 WL 4724625, at *5; *Kroger, Inc. v. O'Donnell*, Civ. No. 07-3091, 2007 WL 3232586, at *3 (D.N.J. Oct. 31, 2007) (affirming the determination of then-Magistrate Judge Patty Shwartz). That being said, the Third Circuit has declined to reverse a district court's extension of "great

deference" to a plaintiff's choice of forum, even in the face of a permissive forum selection clause. *Wall*, 756 F. App'x at 192 (citation omitted).

Meridian's choice of forum is entitled to some deference; it is a New Jersey-based corporation, a New Jersey forum is obviously convenient, and the reason for the choice is apparent. *Kroger*, 2007 WL 3232586, at *3. But because Meridian consented, even on a permissive basis, to the possibility of a suit in Ontario, I temper that deference. *Jumara v. State Farm Ins. Co.*, 55 F.3d 873, 880 (3d Cir. 1995). Thus, I will give weight to Meridian's choice of forum, but it is not so nearly dispositive as it would be absent the forum selection clause.

### b.  Adequate Alternative Forum

Under the second factor, EuroTec must show that an Ontario court is an adequate alternative forum. A forum is adequate if (1) all defendants are amenable to process there, and (2) the claims are cognizable there. *Piper Aircraft Co. v. Reyno*, 454 U.S. 235, 254 & n.22 (1981); *see also Wilmot v. Marriott Hurghada Mgmt., Inc.*, 712 F. App'x 200, 203 (3d Cir. 2017). As to the first prong, because EuroTec is located in Ontario and also agreed to jurisdiction there, I am satisfied that it would be amenable to process there. *See Hage v. Am. Bd. of Obstetrics & Gynecology*, Civ. No. 19-21198, 2020 WL 3056442, at *7 (D.N.J. June 9, 2020). As to the second prong, there is no evidence either way as to an Ontario court's willingness or ability to hear the claims. These are, however, familiar contract and tort matters, and I will not assume, in the absence of evidence, that they are not cognizable in the Ontario courts. *E.g.*, *Archut v. Ross Univ. Sch. of Vet. Med.*, Civ. No. 10-1681, 2013 WL 5913675, at *5 (D.N.J. Oct. 31, 2013).

In short, Meridian has not meaningfully put the adequacy of Ontario courts in issue. I will therefore assume that the claims could be heard there.

### c.  Private Interest Factors

Third, I consider "private interest factors," including "[1] the ease of access to sources of proof; [2] ability to compel witness attendance if necessary;

[3] means to view relevant premises and objects; and [4] any other potential obstacle impeding an otherwise easy, cost-effective, and expeditious trial." *Kisano*, 737 F.3d at 873. EuroTec makes no argument on these factors; that alone would support an adverse finding. *Ansell Healthcare Prods. LLC v. GlycoBioScis. Inc.*, Civ. No. 16-9254, 2018 WL 1178043, at *4 (D.N.J. Jan. 26, 2018), *report & recommendation adopted*, 2018 WL 1178268 (D.N.J. Mar. 6, 2018).

Regardless, these factors do not appear to weigh in EuroTec's favor. In an age of electronic discovery, the physical location of EuroTec records in Ontario has little significance. *Networld*, 2014 WL 4724625, at *5. I acknowledge that EuroTec's witnesses may be beyond this Court's subpoena power. I also consider, however, that most are likely in the control of EuroTec, which has not demonstrated that any of its witnesses would resist testifying. *Id.* at *6. Golanbari has already been deposed from Canada via video conference, suggesting that taking witness testimony will not be an issue. There is no indication that any premises and objects need to be viewed in person. (The helicopter itself was lost in the accident. (Compl. ¶ 33.)) Finally, EuroTec has not alerted me to any other miscellaneous obstacles. I am aware that Canada has imposed COVID-19-related travel restrictions. Gov't of Canada, *Coronavirus disease (COVID-19): Who can travel to Canada* (updated Feb. 12, 2021), https://www.canada.ca/en/immigration-refugees-citizenship/services/coronavirus-covid19/travel-restrictions-exemptions.html. The pandemic is no less prevalent in the U.S., however; the case is very far from a trial date; and, thankfully, vaccination is proceeding and may change our situation for the better. In the meantime, discovery seems to be proceeding smoothly, a credit to the professionalism of both sides.

Thus, the private interest factors are neutral at best, and in any event do not favor EuroTec.

### d. Public Interest Factors

Fourth, I assess "public interest factors," including (1) the comparative administrative difficulties, (2) the law to be applied in the case, and (3) the forums' relative interests in trying the case. *Kisano*, 737 F.3d at 873 (listing factors); *see Delta Air Lines, Inc. v. Chimet, S.p.A.*, 619 F.3d 288, 295 (3d Cir. 2010) (explaining that the factors to be considered depend on the case). EuroTec, again, makes only bare arguments along these lines, and the factors do not seem to tip in its favor.

First, as to administrative difficulties, EuroTec argues that it will be difficult for Meridian to enforce this Court's judgment in Ontario. (Mot. at 30.) To be sure, enforcement of a New Jersey judgment in New Jersey might involve fewer steps. But even cursory research reveals that Ontario courts have well-settled procedures for enforcing American judgments. *JJB Collateral LLC v. Rochon*, 2020 ONSC 1732 (Can. Ont. Sup. Ct. J.) (WL); *Dish v. Shava*, 2018 ONSC 2867 (Can. Ont. Sup. Ct. J.), *aff'd*, 2019 ONCA 411 (Can. Ont. C.A.) (WL); *see also Reiser (UK) Ltd. v. Bryant*, 494 F. Supp. 2d 28, 32 (D. Mass. 2007) (no dispute that Canadian courts could enforce American judgments).

Second, EuroTec argues that the Agreement requires application of Ontario law, with which Ontario courts are more familiar. (Mot. at 30.) While federal courts are often called upon to apply the laws of other states and countries, I claim no expertise in Ontario law, and I therefore take EuroTec's point. On a closer look, it may have less force, however. The Agreement is unclear as to whether Ontario law would apply to the tort claims, as opposed to contract claims. I also take judicial notice that U.S. and Canadian contract law spring from a mutual common-law tradition.

Third, EuroTec acknowledges that "local interests" and "public policy" "do not favor either party." (Mot. at 30.) I agree that this subfactor is neutral. Courts in this District have recognized New Jersey's interest in providing a forum for its residents, *Networld*, 2014 WL 4724625, at *7 (citations omitted), Ontario has a corresponding interest. Further, there is no clear center for this

case. *Compare Kroger*, 2007 WL 3232586, at *5 (dismissal warranted when "[a]ll the parties to the contract reside in Ireland and the culpable conduct allegedly occurred there"). Important public interests would be served in either jurisdiction.

\* \* \*

Putting the four factors together, I find that EuroTec has made a weak showing on the private and public interest factors. That showing is insufficient to overcome even the lesser deference I give to Meridian. Thus, EuroTec's motion to dismiss on *forum non conveniens* grounds is denied.

## III.   CONCLUSION

For the reasons set forth above, the motion to dismiss is denied.

A separate order will issue.

Dated: February 22, 2021

/s/ Kevin McNulty

_____

**Hon. Kevin McNulty**
**United States District Judge**